**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **STEPHANIE POWELL,** ) | **CASE NO. 4:04 CV 02320** |
| **THOMAS POWELL,** ) | |
| ) | **JUDGE PETER C. ECONOMUS** |
|     **PLAINTIFFS** ) | |
| ) | |
|   **V.** ) | |
| ) | |
| **JOSE MORALES, et al.,** ) | **MEMORANDUM OPINION** |
| ) | **AND ORDER** |
|     **DEFENDANTS.** ) | |

This matter is before the Court upon the Motion for Summary Judgment of Defendant Jose Morales. See (Dkt. #17).

## I. FACTUAL HISTORY

The following facts are undisputed unless otherwise noted. On July 16, 2003, Plaintiff Stephanie Powell ("Powell") entered into a Lease Agreement with Defendant Juan Geraldino ("Geraldino"), the owner of the residence located at 214 S. Bruce Street, Youngstown, Ohio ("the Residence"). See (Compl. ¶ 3). Pursuant to the terms of the Lease Agreement, Powell agreed to pay rent in the amount of $200.00 per month.[1] See (Compl.

---

[1] The Lease Agreement listed the names of persons occupying the Residence as Powell, Plaintiff Thomas Powell, and Powell's three minor children. (Compl. ¶ 4.)

-1-

¶ 5). The Plaintiffs performed their obligations under the Lease Agreement from July 16, 2003 until early 2004. See (Compl. ¶ 7).

On March 12, 2004, Detective Jose Morales ("Morales") of the Youngstown Police Department received information that a male Hispanic subject who could not speak English required assistance in resolving a dispute with renters. See (Dkt. # 17, Aff. of Jose Morales ("Morales Aff.") ¶ 2). The Hispanic subject, later identified as Geraldino, advised Morales: (1) that Powell had not made any rent payments for three months; (2) that he was experiencing difficulty in locating Powell; (3) that he repeatedly observed heavy traffic (approximately 10-12 persons) entering and exiting the Residence; and (4) that there was no electricity at the Residence. See (Morales Aff. ¶¶ 5-6). Morales responded that "any problem with the renter not paying the rent must be handled through the Youngstown Municipal Clerk of Courts and other proper channels." (Morales Aff. ¶ 8.) Geraldino then displayed purported copies of an eviction notice. See (Morales Aff. ¶ 3). Geraldino expressed his concern that the Residence was being utilized to sell illegal substances and that the Residence was in a state of disrepair. See (Morales Aff. ¶ 8). Morales informed Geraldino that he would "drive by and check the house." (Morales Aff. ¶ 9.)

Morales thereafter traveled to the Residence and observed two to three subjects enter the house and exit within a few minutes. See (Morales Aff. ¶ 10). Morales radioed Youngstown Police Department dispatch to advise as to his location and request that a two-man unit travel to the Residence. See (Morales Aff. ¶¶ 10-12). Youngstown Police Department Officers Coleman and Joliff promptly arrived at the Residence. See (Morales

Aff. ¶ 12).

The events that follow are largely in dispute.

Morales's version of events proceeds as follows: Officers Coleman and Joliff approached the front door and observed that it was open. See (Morales Aff. ¶ 13). A male and female occupant immediately came to the front door and "let" Officers Coleman and Joliff into the Residence. (Morales Aff. ¶ 14.) Morales then entered the Residence. See (Morales Aff. ¶ 14).

Once inside, Morales observed eight to ten occupants and detected a heavy odor of marijuana. See (Morales Aff. ¶ 15). He further observed several small bags on a table with what appeared to be marijuana residue and seeds, a small scale, and new plastic bags. See (Morales Aff. ¶ 15). As the officers began to observe other persons exiting various rooms in the Residence, they became concerned for their safety. See (Morales Aff. ¶ 16). The officers consequently began to search each occupant for weapons and ordered the occupants to "walk outside." (Morales Aff. ¶ 16.)

Morales enquired of a white female occupant as to the whereabouts of the person responsible for paying rent. See (Morales Aff. ¶ 17.) The female responded that she had "taken the house over from her cousin, Stephanie Powell." (Morales Aff. ¶ 17.) Morales "advised the white female subject that the lease contract [was] in Ms. Powell's name, that the landlord indicated to [him] that rent had not been paid in the last three months and that the eviction process had started against Ms. Powell by the landlord." (Morales Aff. ¶ 18.) Morales observed what he believed to be an eviction notice on the floor in the living room.

See (Morales Aff. ¶ 18). Morales ultimately instructed "that everybody [] leave until the person on the lease (Ms. Powell) could take care of the problem with the landlord." (Morales Aff. ¶ 19.) The officers were present at the Residence for a period of four minutes. See (Morales Aff. ¶ 24).

The Plaintiffs present a dramatically different account of their encounter with Morales. The Plaintiffs contend that the officers entered the Residence forcibly and without their consent. See (Dkt. # 23, Aff. of Thomas Powell ("T. Powell Aff.") ¶ 8; Dkt. # 23, Aff. of Kimberly Powell ("K. Powell Aff.") ¶¶ 8-9). Specifically, Thomas Powell contends that Morales and two other officers approached the premises stating that they possessed an eviction notice. See( T. Powell Aff. ¶ 7). When Thomas Powell questioned Morales concerning whether there was a right to enter the Residence without a warrant, Morales pushed him into a wall. See (T. Powell Aff. ¶ 9). Thomas Powell contends that Morales's conduct aggravated a pre-existing coronary condition (double heart by-pass surgery) thereby requiring emergency treatment. See (T. Powell Aff. ¶ 10). Kimberly Powell, Powell's mother, asserts that she was the only white female at the Residence and that she did not indicate that her daughter had abandoned the Residence. See(K. Powell Aff. ¶ 15). In addition, Kimberly and Thomas Powell assert that there were no drugs or illegal contraband at the Residence. See (T. Powell Aff. ¶ 14; K. Powell Aff. ¶ 14). Moreover, the plaintiffs contend that the officers conducted a search of the Residence whereby their furniture and other household items were overturned and damaged. See (T. Powell Aff. ¶ 18; K. Powell Aff. ¶ 18). The plaintiffs further contend that there were no eviction

-4-

proceedings pending against them; consequently, the officers did not present an eviction notice or observe said notice on the floor. See (T. Powell Aff. ¶ 11; K. Powell Aff. ¶ 11). The plaintiffs claim that they have not returned to the Residence to obtain their property since complying with Morales's order to vacate the Residence. See (T. Powell Aff. ¶ 18; K. Powell Aff. ¶ 18).

Geraldino thereafter initiated eviction procedures against the plaintiffs pursuant to Ohio law. Accordingly, on March 26, 2004, Geraldino filed a complaint in forcible entry and detainer against the Plaintiffs in the Youngstown Municipal Court. See (Dkt. # 23, Ex. # 1). On April 13, 2004, a hearing was held at the Youngstown Municipal Court whereby the plaintiffs failed to appear. See (Dkt. # 25, Ex. A). As a result, the court entered a default judgment in favor of Geraldino and declared the plaintiffs evicted from the Residence. See (Dkt. # 25, Ex. A).

On November 22, 2004, the plaintiffs filed their Complaint against Morales, Geraldino, the City of Youngstown ("Youngstown") and unidentified officers alleging nine "counts": (1) a claim advanced pursuant 42 U.S.C. § 1983 arising from violations of the Procedural Due Process Clause of the Fourteenth Amendment to the Constitution of the United States (Compl. ¶¶ 18-28); (2) a claim advanced pursuant to 42 U.S.C. § 1983 arising from violations of the Search and Seizure Clause of the Fourth Amendment to the Constitution of the United States (Compl. ¶¶ 29-36); (3) a conspiracy claim, asserted pursuant to 42 U.S.C. § 1985 (Compl. ¶¶ 37-41); (4) a conspiracy claim, asserted pursuant to 42 U.S.C. § 1983 and the laws of the State of Ohio (Compl. ¶¶ 42-45); (5) an assault and

battery claim (Compl. ¶¶ 46-53); (6) an unlawful eviction claim pursuant to Ohio Revised Code sections 5321.04(A)(7), (8) and 5321.15 (Compl. ¶ 54-57); (7) an invasion of privacy claim (Comp. ¶¶ 58-60); (8) a conversion claim (Compl. ¶¶ 61-63); and (9) a breach of contract claim (Compl. ¶¶ 64-66).

On January 3, 2005, defendants Youngstown, Morales and the unidentified officers filed an Answer to the Complaint wherein they asserted the defense of qualified immunity. (Dkt. # 7).

On February 18, 2005, the Court issued an Order instructing defendant Morales to file a motion addressing the issue of qualified immunity. See (Dkt. #13). Accordingly, on March 18, 2005, Morales filed a summary judgment motion based on qualified immunity. (Dkt. #17.) The plaintiffs filed a Memorandum in Opposition on April 29, 2005. (Dkt. #23.) Morales filed his reply brief on May 19, 2005. (Dkt. #25.)

Geraldino failed to file a responsive pleading in this action. See (Dkt. # 15). The Court granted the plaintiffs' request for default judgment and entered judgment in favor of the plaintiffs against Geraldino in the amount of $9,124, with interest and costs. See (Dkt. # 20).

## II. STANDARD OF REVIEW

Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). "Rule 56 (c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of

an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In considering such a motion, the court must review all of the evidence in the record. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); accord Graham-Humphreys v. Memphis Brooks Museum of Art, Inc., 209 F.3d 552, 556-57 n.7 (6th Cir. 2000). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

"A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323 (quoting FED. R. CIV. P. 56(c)). The movant meets this burden "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Clayton v. Meijer, Inc., 281 F.3d 605, 609 (6th Cir. 2002) (quoting Celotex, 477 U.S. at 324-25). The non-movant then "must set

forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

"The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting Anderson, 477 U.S. at 250). "A mere scintilla of evidence is insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 250.

### III. QUALIFIED IMMUNITY AND 42 U.S.C. § 1983

Title 42 of the United States Code §1983 provides, in pertinent part:

Every person who, under color of statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any privileges, or immunities secured by the Constitution and laws, shall be liable to the injured party at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. Section 1983 does not establish any individual rights, rather, it is merely a vehicle whereby a litigant may assert a constitutional violation. See Braley v. City of Pontiac, 906 F.2d 220, 223 (6th Cir. 1990) (stating that section 1983 "creates a right of action for the vindication of constitutional guarantees found elsewhere"). It is axiomatic that the provisions of 42 U.S.C. section 1983 are triggered only in the presence of state action and that a private entity acting on its own cannot deprive citizens of certain rights secured by the Constitution. See Lansing v. City of Memphis, 202 F.3d 821 (6th Cir. 2000). To state a claim under 42 U.S.C. section 1983, the plaintiff must establish that "(1)

a person, (2) acting under color of state law, (3) deprived the plaintiff of a federal right." Berger v. City of Mayfield Heights, 265 F.3d 399, 405 (6th Cir. 2001) (citing Soper ex rel. Soper v. Hoben, 530 U.S. 1262 (2000)).

When officials are sued in their individual capacities pursuant to section 1983, they may be protected from liability for damages if their alleged wrongful conduct was committed while they performed a function protected by qualified immunity. See Cagle v. Gilley, 957 F.2d 1347, 1348 (6th Cir. 1992). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). The privilege is an "immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Id. Consequently, qualified immunity questions must be resolved at the earliest possible stage in litigation. See Saucier v. Katz, 533 U.S. 194 (2001).

Government officials are generally entitled to qualified immunity when performing discretionary functions as long as the conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1981). In order to assert a violation of a "clearly established" right and defeat a qualified immunity defense, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). In other words, "in the light of pre-existing law the unlawfulness must be apparent." Id. Qualified immunity protects "all by the plainly incompetent of those who knowingly violate the law." Malley

v. Briggs, 475 U.S. 335, 341 (1986).

Consequently, a plaintiff opposing qualified immunity must answer this threshold question: whether the facts, taken in the light most favorable to the plaintiffs, demonstrate that an official's conduct violated a constitutional right.  See Saucier, 533 U.S. at 198.  If no constitutional right would have been violated were the allegations established, the Court must terminate the qualified immunity inquiry and dismiss the suit.  Id.

On the other hand, if the plaintiff answers the question in the affirmative, "the next, sequential step is to determine whether the right was clearly established."  Id.  With regard to this second step, the plaintiff must rely on either Supreme Court precedent, controlling precedent, or cases from other courts which "point unmistakably to the unconstitutionality of the conduct and are so clearly foreshadowed by the applicable direct authority as to leave no doubt in the mind of the reasonable officer that his conduct was unconstitutional."  Mumford v. Zieba, 4 F.3d 429, 432-33 (6th Cir. 1993).  If the plaintiff fails to establish either the existence of a constitutional violation or that such a violation was clearly established, the Court must dismiss the action.  See Saucier, 533 U.S. at 198.

Individual claims of immunity must be analyzed on a fact-specific, case-by-case basis to determine whether the constitutional rights were so clearly established when the alleged misconduct was committed that any official in the defendant's position would understand that what they were doing violates those rights.  See Anderson, 483 U.S. 635, 640 (1987).

It is the province of the jury, not the court, to decide any factual disputes.  However,

the court ultimately decides the question of whether "any officer in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained form such conduct." Adams v. Metiva, 31 F.3d 375, 387 (1994).

## IV. ANALYSIS

### A. PROCEDURAL DUE PROCESS

The plaintiffs assert that Morales's removal of them from the Residence without the initiation of eviction procedures and an order from the court violated their right to Procedural Due Process as secured by the Fourteenth Amendment. See (Compl. ¶ 19).

The Fourteenth Amendment provides that "no State shall deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV. To establish a procedural due process claim, the plaintiffs are required to demonstrate the existence of a constitutionally protected liberty or property interest and show that such interest was deprived without appropriate process. See Board of Regents v. Roth, 408 U.S. 564, 569-70 (1972). "First, the court must determine whether the interest at stake is a protected liberty or property right under the Fourteenth Amendment. Only after identifying such a right [does the court] consider whether the deprivation of that interest contravened notions of due process." Thomas v. Cohen, 304 F.3d 563, 576 (6th Cir. 2002).

The Fourteenth Amendment's protection of "property" has not been interpreted to safeguard only the rights of undisputed ownership; indeed, it has been read broadly to extend protection to "any significant property interest." Fuentes v. Shevin, 407 U.S. 67, 86 (1972). Possessory interests in leased property invoke procedural due process protection.

-11-

See Thomas, 304 F.3d at 576; see also Grayden v. Rhodes, 345 F.3d 1225, 1232 (11th Cir. 2003) ("Continued residency in leasehold property is a significant interest in property subject to due process."); Vill. Condo. Owners Assoc. v. Montgomery County Bd. of Revision, No. 20082, 2004 Ohio App. LEXIS 2742, at *11 (June 10, 2004) ("A complainant who holds a leasehold estate does have legal title to and a possessory right in the real property under a lease for a term of years."). It is undisputed that Stephanie and Thomas Powell were legal residents pursuant to a lease executed by Geraldino and Plaintiff Stephanie Powell. See (Compl. ¶ 4; T. Powell Aff. ¶ 3). Thus, the plaintiffs has demonstrated a constitutionally protected property interest in the Residence.

The removal of the plaintiffs from the Residence is a deprivation of their property rights under the Fourteenth Amendment. It is undisputed that the plaintiffs were not provided a choice to leave the Residence, but were instructed to do so by Morales. See (Morales Aff. ¶ 18; Compl. ¶ 10; T. Powell Aff. ¶ 18; K. Powell Aff. ¶ 18). Morales concedes that he was not acting as a judicial officer on the behalf of the Municipal Court. See (Morales Aff. ¶ 28). It follows that Morales compelled the occupants of the Residence to vacate without his having any authority to engage in such activity.

The Court acknowledges that the facts are disputed as to the amount of time that Morales instructed Thomas Powell to vacate the Residence. The plaintiffs allege that Morales advised all individuals at the Residence that they were there illegally and ordered them to permanently vacate the Residence. See (T. Powell Aff. ¶ 18; K. Powell Aff. ¶ 18). In contrast, Morales maintains that he instructed the occupants to leave the Residence only

until Powell could resolve issues of alleged non-payment of rent and eviction with Geraldino. See (Morales Aff. ¶¶ 18-19). Nevertheless, "a temporary, nonfinal deprivation of property is nonetheless a 'deprivation' in terms of the Fourteenth Amendment." Fuentes, 407 U.S. at 85. Indeed, "[t]he Fourteenth Amendment draws no bright lines around three-day, 10-day or 50-day deprivations of property. Any significant taking of property by the State is within the purview of the Due Process Clause." Id. at 86. Thus, assuming arguendo that Morales instructed Thomas Powell to vacate the Residence on a temporary basis, such a deprivation is nonetheless prohibited by the Fourteenth Amendment.

As Morales deprived that plaintiffs of their property interest in the Residence, the Fourteenth Amendment requires that the plaintiffs be provided with due process. Generally, due process requires notice and a hearing at some time before a person is deprived of his property interests. See Wolff v. McDonnell, 418 U.S. 539, 557-558 (1974). The Supreme Court additionally has held that "when deprivations of property are effected through random and unauthorized conduct of a state employee, predeprivation procedures are simply impracticable since the state cannot know when such deprivations will occur." Hudson v. Palmer, 468 U.S. 517, 533 (1984). An unauthorized intentional deprivation of property by a state actor does not constitute a violation of Fourteenth Amendment Procedural Due Process where a meaningful postdeprivation remedy for the loss is available. See id.

The record reveals that the plaintiffs were not provided with a predeprivation hearing. It is undisputed that no complaint in forcible entry and detainer under Ohio law

had been filed at the time Morales instructed Thomas Powell to vacate the Residence. One of the few cases delineating the right to a pre-eviction hearing provides that "[a] prior hearing is not constitutionally required where there is a special need for very prompt action to secure an important public interest and where a government official is responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in a particular instance." Flatford v. City of Monroe, 17 F.3d 162, 167 (6th Cir. 1994). However, Morales does not advance any argument that he ordered the plaintiffs from the Residence in order to enforce a statute. As noted *supra*, he concedes that he was not acting under any authority to enforce the alleged eviction notice. Therefore, Morales's removal of Thomas Powell from the Residence was an unauthorized deprivation of property.

It nevertheless is further undisputed that the plaintiffs were provided with a postdeprivation hearing on April 13, 2004 at which they failed to appear. See (Dkt. #25, Ex. A). The State of Ohio has established a three-step procedure which must be followed by a landlord before a court will order the tenant to vacate the premises: (1) a notice of termination of tenancy; (2) a notice to vacate the premises; and (3) a complaint in forcible entry and detainer. OHIO REV. CODE ANN. §§ 5321.17, 1923.04 (Anderson 2005); Siegler v. Batdorff, 63 Ohio App. 29, 76 (8th Dist. 1979). The uncontroverted evidence reveals that the plaintiffs failed to appear at the hearing. It is beyond cavil that the plaintiff cannot now challenge their eviction when they failed to exercise their rights through constitutionally sufficient post-deprivation procedures.

Accordingly, judgment is awarded to Morales on "Count One" of the plaintiffs' Complaint alleging violations of procedural due process.

### B.     SUBSTANTIVE DUE PROCESS

The plaintiffs allege that the defendants' conduct "shocks the conscience." It is well-established that the Due Process Clause includes a substantive component that "provides heightened protection against government interference with certain fundamental rights and liberty interests." Washington v. Glucksberg, 521 U.S. 702, 720 (1997). Specifically, violations of substantive due process may be subdivided into two categories: (1) deprivations of a particular constitutional guarantee and (2) actions that shock the conscience. See Mansfield Apartment Owners Assoc. v. City of Mansfield, 988 F.2d 1469, 1473-74 (6th Cir. 1993).

While the plaintiffs asserts that the defendants' actions shock the conscience, they make no additional reference to substantive due process in the Complaint. Rule 8 of the Federal Rules of Civil Procedure requires the plaintiffs to set forth pleadings that contain a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a). The purpose of the pleading requirement is to ensure that defendants have notice of the type of claims brought against them in order to properly order their defense. See Conley v. Gibson, 355 U.S. 41, 47 (1957).

The Complaint fails to comply with Rule 8 to the extent that the plaintiffs intend to advance a claim for violations of substantive due process. Morales raised the issue in his motion for summary judgment, see  (Dkt. # 17 at 15); however, the plaintiffs failed to

-15-

amend the Complaint or clarify their claims in their responsive filings. Consequently, the Court finds that judgment is granted to Morales to the extent that the Complaint advances claims arising from violations of substantive due process.

### C.     UNREASONABLE SEARCH AND SEIZURE

The plaintiffs assert that Morales violated their Fourth Amendment rights by subjecting them to an unreasonable search and seizure. See (Compl. ¶¶ 31-32).

The Fourth Amendment protects the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures. U.S. CONST. amend. IV; Thus, the Fourth Amendment protects two types of expectations: one involving searches, and the other seizures. See United States v. Jacobsen, 466 U.S. 109, 113 (1984). A search occurs when an expectation of privacy that society is prepared to consider is infringed, whereas a seizure of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." Id.

The Fourth Amendment prohibits warrantless searches, unless an exception to the warrant requirement applies. See United States v. Roark, 36 F.3d 14, 17 (6th Cir. 1994). "A police officer's warrantless entry into a home is presumptively unconstitutional under the Fourth Amendment." See Ewolski v. City of Brunswick, 287 F.3d 492, 501 (6th Cir. 2002) (citing O'Brien v. City of Grand Rapids, 23 F.3d 990, 996 (6th Cir. 1992)). The party who claims a protected Fourth Amendment right bears the burden of making a prima facie showing of illegal entry, after which the burden shifts to the government to prove that the entry was justified. See United States v. Murie, 534 F.2d 695, 697-98 (6th Cir. 1976).

As indicated in the factual history of this case, the parties disputes the circumstances giving rise to the search, the defendants' conduct in executing the search, and the extent of the search. Virtually every detail – from the officers' approach to the Residence through Morales's instructions to the occupants – are in dispute. With this divergent factual record, it would be an exercise in speculation for the Court to determine whether any exception to the warrant requirement was necessary and, if so, whether it was satisfied.

Morales points out that the affidavits of Thomas and Kimberly Powell do not explicitly state that they are based on personal knowledge – therefore, the plaintiffs have failed to meet their burden to present a genuine issue of material fact. Under Rule 56(e) of the Federal Rules of Civil Procedure, "affidavits shall be made on personal knowledge [and] shall set forth such facts as would be admissible in evidence." FED. R. CIV. P. 56(e). "It is well settled that courts should disregard conclusions of law (or 'ultimate fact') found in affidavits" submitted for summary judgment. See F.R.C. Int'l. Inc. v. United States, 278 F.3d 641, 643 (6th Cir. 2002). Additionally, the Rule does not require the affiants to use any "magic words." See Kemper v. Saline Electronics, 348 F. Supp. 2d 897 (OH.N.D. 2004 Katz, J.) Here, the affidavits provide that they are made under oath and bear a notary seal. The affidavits provide inherently personal information regarding the affiants (i.e., Kimberly Powell is the mother of Stephanie Powell) and do not extend beyond facts that reasonably can be construed as within their personal knowledge. Therefore, the Court

determines that the affidavits are compliant with Rule 56(e)

Accordingly, the Court finds that general issue of material fact exist as to the plaintiffs claim advanced pursuant to 42 U.S.C.§ 1983 arising from violations of the Fourth Amendment.

## V. CONCLUSION

For the foregoing reasons, the Court hereby orders that the Motion for Summary Judgment of Defendant Jose Morales, see (Dkt. #17), is **GRANTED IN PART and DENIED IN PART**. Judgment is granted in favor of Morales on the plaintiffs' claims brought pursuant to 42 U.S.C. § 1983 arising from violations of the Due Process Clause of the Fourteenth Amendment ("Count I"). The motion is denied with regard to the plaintiffs' claim brought pursuant to 42 U.S.C. § 1983 arising from violations of the Fourth Amendment ("Count II").

**IT IS SO ORDERED.**

                                      **/s/ *Peter C. Economus* - March 17, 2005**
                                      **PETER C. ECONOMUS**
                                      **UNITED STATES DISTRICT JUDGE**